## CHAPMAN v. CARLOCK et al.

No. 11781—Opinion Filed Sept. 23, 1924.

Rehearing Denied Nov. 18, 1924.

**Oil and Gas—Departmental Lease—Forfeiture—Notice Essential—Prerequisite to Suit for Cancellation.**

Where an oil and gas mining lease, upon the departmental form prescribed by the Secretary of the Interior, provides that "upon the violation of any of the substantial terms and conditions of this lease the Secretary of the Interior (or lessor, in event restrictions are removed, as provided in paragraph 12, hereof) shall have the right, at any time after thirty days' notice to the lessee specifying the terms or conditions violated, to declare this lease null and void, and the lessor shall then be entitled and authorized to take immediate possession of the land," the giving of the notice therein referred to is an essential prerequisite to a cancellation and forfeiture of the lease. In order to comply with said provision of said lease it is necessary to notify the lessees of the terms of the lease that have been violated, and that if the same are not complied with within 30 days, then the lease will be considered forfeited. Held, such notice is a fundamental prerequisite to a suit for the cancellation of such lease; and where no such notice as prescribed by the foregoing provision has been given, no cancellation can be had. Pierce Oil Corporation v. Schacht, 75 Okla. 101, 181 Pac. 731, and Guffey v. Smith, 59 L. Ed. (U. S.) 856, followed.

(Syllabus by Lyons, C.)

Commissioners' Opinion, Division No. 2.

Error from District Court, Carter County; Thomas W. Champion, Judge.

Action by J. H. Carlock and another against Fred A. Chapman. Judgment for plaintiff, and defendant appeals. Reversed.

R. A. Hefner, for plaintiff in error.

Ledbetter & Ledbetter, for defendants in error.

Opinion by LYONS, C. Fred A. Chapman holds an oil and gas mining lease on departmental form executed by Lewis Frye, a full-blood citizen of the Choctaw Nation; said lease having been duly approved by the Secretary of the Interior and becoming effective on October 3, 1916. On January 16,

1917, thereafter, Frye died, leaving surviving him certain full-blood Indian heirs. The premises covered by the lease were conveyed by the heirs on January 23, 1917, and thereafter, on April 16, 1917, said conveyance was approved by the county court of Pittsburg county, Okla., which was the proper federal agency under the Act of May 27, 1908. The defendants in error hold under this conveyance.

Immediately upon securing this conveyance, the defendants in error took up with the United States Indian Superintendent at Muskogee, the matter of securing "the relinquishment of supervision" by the Indian office. This question was still pending before the United States Indian Superintendent at Muskogee on October 3, 1917, the date on which advance royalty and rentals would ordinarily have been paid under the lease. The defendants in error had, however, recorded their conveyance in the proper recordation office in the county in which the land was located. On September 27, 1917, while the application for "relinquishment of supervision" was pending in the office of the United States Indian Superintendent at Muskogee, Chapman paid the advance royalty and rental to the United States Indian Superintendent at Muskogee and received a receipt therefor from said office. Chapman was further advised by the Indian office that his lease was in good standing for another year.

Thereafter, in November, 1917, the Indian office advised Chapman that the lands had been sold; that supervision had been relinquished on November 1, 1917 (after the payment and receipt of Chapman's advance royalty and rental), and that the lands had been unrestricted since March 3, 1917. (The date given by the Indian office as the date on which the lands became unrestricted was probably erroneous by a matter of a few days and is immaterial here.) The lands became unrestricted on April 16, 1917, being the date of the order of approval of a full-blood's conveyance by the county court of Pittsburg county. Parker v. Richards 63 L. Ed. (U. S.) 954.

This letter from the Indian office was the first actual knowledge or notice received by Chapman of the change in ownership. The department at Muskogee (United States Indian Superintendent's office) attempted to return the rentals and royalties to Chapman, who, on the advice of counsel, refused to accede to such return and declined to change his position or lose any benefit which he may have received by making such payment.

The oil and gas mining lease specified as

a depository at which rentals might by paid in the event of removal of restrictions, the First National Bank of Antlers, Antlers, Okla. Chapman, on receiving actual notice of the sale or transfer, addressed a letter containing a draft covering the full amount of advance royalty and rental to this depository. No such depository existed for the reason that there was no such bank. However, the Antlers National Bank received the money, deposited it to the credit of the defendants in error, the owners of the land, and notified them of such deposit. The defendants in error refused to accept the rentals and refused all subsequent tenders. The defendants in error purchased the land with constructive notice of Chapman's oil and gas mining lease, and paid approximately $2,500 therefor, based upon the theory that said lands were incumbered by said lease and that the lease was valid and subsisting. It is clear from the testimony that Chapman was anxious and zealous to pay the rentals and advance royalty in due time in order to keep the lease in good standing. It is equally clear that the defendants in error would have been fully reconciled to a failure on the part of Chapman to make payment.

It is not necessary for us to go far to see the reason for this situation and it is not necessary to make any criticism on account thereof. The lease had become worth from $25,000 to $40,000, and this increase in value furnished the motive for this controversy.

Upon this state of facts the court found for the defendants in error generally, and made the following findings of fact, which are material in reaching a judgment in this court:

"11. The court further finds that the said Fred A. Chapman was seemingly in good faith and diligent in his efforts to pay the rentals due under said lease contract as provided therein, but that his failure to take notice of the records of the county clerk's office of Carter county, Okla., showing a change in ownership of said land, and the further fact that the defendant resided in Carter county, Okla., and was here a great portion of the time was gross negligence on his part.

"12. The court further finds that 30 days notice was not given Fred A. Chapman of any intention of the said Carlock and Ledbetter to cancel said lease, specifying the grounds for cancellation.

"13. The court further finds that on the 8th day of January, 1918, the defendant Fred A. Chapman, tendered for the first time to J. H. Carlock and G. T. Ledbetter in person the royalties and rentals which were due them October 3d, 1917, and which rentals were refused.

"14. That all subsequent rentals due after October 3d, 1917, were tendered in due time but refused by Carlock and Ledbetter.

"15. The court further finds that on the 27th day of September, 1917, the Superintendent of the Five Civilized Tribes, Muskogee, Oklahoma, acknowledged receipt of draft number 40092, bank exchange $256.38, for royalties and rentals, lease of Lewis Frye, signed by W. M. Baker, cashier, which receipt was forwarded by mail to the said Fred A. Chapman and received by him; that thereafter and on November 19, 1917, he was advised by letter, signed by Gabe E. Parker, Superintendent of the Five Civilized Tribes, that their records showed that the land had been sold to H. C. Ledbetter, and that their office had relinquished jurisdiction and that said land had been unrestricted and the lease thereon, since March 3, 1917, and supervision relinquished November 1st, 1917, and the $256.38 which the said Fred A. Chapman had deposited as rentals and royalties covering said land, were returned to him by official check number 11720, as of date November 19, 1917, and that Chapman had not been notified by the owners of the land or by the Department at Muskogee that Carlock and Ledbetter were the persons to whom the rentals were due, except as herein otherwise found."

It is our duty to weigh the evidence and determine: (a.) Whether the findings of fact are clearly against the weight of the testimony; (b.) whether the judgment is contrary to the findings of fact or contrary to law.

It is necessary to consider the terms of the oil and gas mining lease. The applicable provisions are as follows:

"(3) Until a producing well is completed on said premises the lessee shall pay, or cause to be paid to the Superintendent Union Agency, Muskogee, Okla., for lessor, as advance annual royalty, from the date of the approval of this lease, fifteen cents per acre per annum, annually, in advance for the first and second years; thirty cents per acre annually in advance, for the third and fourth years; seventy-five cents per acre per annum, annually, in advance, for the fifth year; and one dollar per acre per annum, annually in advance, for each succeeding year of the term of this lease: it being understood and agreed that such sums of money so paid shall be a credit on stipulated royalties, and the lessee thereby agrees that said advance royalty when paid shall not be refunded to the lessee because of any subsequent surrender or cancellation thereof: nor shall the lessee be relieved from its obligation to pay said advance royalty annually when it becomes due, by reason of any subsequent surrender or cancellation of this lease.

"(4) The lessee shall exercise diligence in sinking wells for oil and natural gas on land covered by this lease and shall drill

at least one well within one year from the date of approval of this lease by the Secretary of the Interior, or shall pay to the United States Indian Superintendent, Union Agency, Muskogee, Okla., for the use and benefit of the lessee, for each whole year the completion of such well is delayed after the date of such approval by the Secretary of the Interior, for not to exceed ten years from the date of such approval, in addition to the other considerations named herein, a rental of one dollar per acre, payable annually; and if the lessee shall fail to drill at least one well within any such yearly period and shall fail to surrender this lease by executing and recording a proper release thereof and otherwise complying with paragraph number seven thereof, or before the end of any such year during which the completion of such well is delayed, such failure shall be taken and held as conclusively evidencing the election and covenant of the lessee to pay the rental of one dollar per acre for each year and thereupon the lessee shall be absolutely obligated to pay such rental. The failure of the lessee to pay such rental before the expiration of fifteen days after it becomes due at the end of any yearly period, during which a well has not been completed as provided herein, shall be a violation of one of the material and substantial terms and conditions of this lease, and the cause for cancellation of such lease under paragraph numbered nine hereof; but such cancellation shall not in any wise operate to release or relieve the lessee from the covenant and obligation to pay such rental, or any other accrued obligation. The lessee may be required by the Secretary of the Interior or by such officer as may be designated by him for the purpose, to drill and operate wells to offset wells on adjoining tracts, and within 300 feet of the dividing line or in case of gas wells lessee may have the option in lieu of drilling offset wells, of paying a sum equal to the royalties which would accrue on each well to be offset if said wells had been drilled and were being operated on the land described herein and in accordance with the terms hereof. It is understood and agreed by the parties hereto that offset wells shall be drilled or royalty paid in lieu of drilling within ten days after the lessee is notified to do so, and failure to comply with such requirement shall constitute a violation of one of the substantial terms of this lease."

"(8)   This lease shall be subject to the regulations of the Secretary of the Interior, now or hereinafter in force, relative to such leases, all of which regulations are made a part and condition of this lease; Provided, however, that no regulations made after the approval of this lease, affecting either the length of term of oil and gas leases, the rates of royalty or payment thereunder or the assignment of leases, shall operate to affect the terms and conditions of this lease.

"(9)   Upon the violation of any of the substantial terms and conditions of this lease the Secretary of the Interior (or lessor in event restrictions are removed as provided in paragraph 12 hereof) shall have the right, at any time after thirty days notice to the lessee specifying the terms and conditions violated, to declare this lease null and void, and the lessor shall then be entitled and authorized to take immediate possession of the land."

"(12)   In event restrictions on alienation shall be removed from all the leasehold premises described above, this lease shall be released from the supervision of the Secretary of the Interior, such release to take effect without further agreement, from the date such restrictions are removed, and thereupon the authority and power delegated to the Secretary of the Interior as herein provided, shall cease and all payments required to be made to the United States Indian Superintendent shall thereafter be made to lessor or the then owner of said lands in person or be deposited to the credit of the said lessor or his assigns at the 1st Nat'l Bank of Antlers, or at such other place as the said lessor or his assigns may from time to time designate in writing, and changes in regulations thereafter made by the Secretary of the Interior applicable to oil and gas leases shall not apply to this lease."

The question of notice of forfeiture required by paragraph No. nine, has been considered by this court and is no longer open to serious doubt. In the case of Pierce Oil Company v. Schact, 75 Okla., 101, 181 Pac. 731, this court, speaking through Mr. Justice McNeill, said:

"Where a departmental oil and gas lease provides, if the lessee fails to comply with any of the terms thereof, that the lessor may declare the lease forfeited upon giving ten days' notice, the notice is not complied with by the lessor notifying the lessee that he has declared the lease forfeited, but in order to comply with said provision in said lease, it is necessary to notify the lessee of the terms of the lease that have been violated, and that, if the same is not complied with within ten days, then the lease will be considered forfeited."

In the case of Guffey v. Smith, 59 L. Ed., at page 865, the Supreme Court of the United States lays down the rule:

"Under it the lessor could have demanded the rent in arrears and have notified the complainants in writing that unless payment was made within the time named in the notice, not less than five days thereafter, the lease would be terminated; and upon a failure to pay within that time he could have treated the lease as ended. But there was no such demand or notice, and consequently no failure to comply with either."

It must be considered that if a notice in

proper form had been given to Chapman by defendants in error, requiring him to make payment of the alleged delinquent rentals and royalties within 30 days upon the pains and penalties of forfeiture, such payment would have been made immediately. The lower court found that Chapman had used diligence in his efforts to make payment

The defendants in error rely on such cases as Frank Oil Co. v. Belleview Oil & Gas Co., 29 Okla. 719, 119 Pac. 260. The oil and gas mining lease in that case differs materially from the one under consideration here. There the lease was a mere option which expired by its own terms at the end of a year, unless payment was made. There was no question of notice or of declaration of forfeiture there. Unless the payment was made the contract was at an end.

The lease before us is wholly different. It provides that the rental would become due under the terms of the lease, and it may be recovered in an action against the lessee and his surety. It further provides that the lease may be forfeited for the breach of a material covenant after a 30 days' notice.

This court has given this paragraph (No. 9) of the lease its only reasonable meaning where a breach is claimed. The Secretary of the Interior (or in the event restrictions have been removed, the owner of the lands) must give a notice to the lessee advising him of the infraction of the terms of the lease, and then if the lessee fails to comply with the terms of said lease within 30 days, the lease becomes forfeited. Pierce Oil Corporation v. Schact, 75 Okla. 101, 181 Pac. 731.

The plaintiff in the court below has not complied with this prerequisite of the contract essential to obtaining a forfeiture, and no forfeiture can be granted.

The findings of fact made by the lower court therefore on this material point require that a judgment should be restored for the plaintiff in error.

It is the judgment of this court therefore that the judgment of the lower court is reversed, and the cause remanded, with directions to enter judgment in favor of the plaintiff in error.

By the Court: It is so ordered.